# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EMMANUEL CABALLERO,

    Plaintiff

v.

ROMEO ARANAS, et. al.,

    Defendants

Case No.: 3:19-cv-00079-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 190

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 190, 190-1 to 190-7, 192, 192-1, 192-2, errata at ECF Nos. 196, 196-1 to 196-3.) Plaintiff filed a response (ECF Nos. 216, 216-1, 216-2) and an addendum to his response (ECF No. 217). Defendants filed a reply. (ECF Nos. 219, 221-1.)  Plaintiff then filed a second addendum to his response, which should be stricken because it was filed without leave of court. (ECF No. 223.)[1]

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (First Amended Complaint

---

[1] Supplementation of a motion, response or reply is prohibited without leave of court, and the court may strike supplemental filings made without leave of court. LR 7-2(g).

1  (FAC), ECF No. 107.) The events giving rise to this action took place while Plaintiff was housed

2  at Northern Nevada Correctional Center (NNCC). (*Id.*)

3      The court screened the FAC and allowed Plaintiff to proceed with an Eighth Amendment

4  claim for deliberate indifference to his serious dental needs against Dr. Yup, Melissa Mitchell,

5  Dr. Mardelle Petersen[2], Dr. Benson, Jennifer Vargas and Summer Jacobsen. (ECF Nos. 74, 106.)

6      Dr. Benson and Summer Jacobsen have been dismissed. (ECF Nos. 150, 183.) The Estate

7  of Gene Hing Yup, through personal representative Catherine Yup (hereinafter, the Estate of Dr.

8  Yup), was substituted in for Dr. Yup after he passed away. (ECF No. 33.) A suggestion of death

9  was filed for Dr. Petersen. (ECF No. 186.) A motion to substitute was not timely made for

10 Dr. Petersen, and the undersigned has recommended that Dr. Petersen be dismissed without

11 prejudice. (ECF No. 252.)

12     Mitchell, Vargas, and the Estate of Dr. Yup move for summary judgment, arguing:

13 Mitchell did not personally participate in the alleged constitutional violation; there was no

14 deliberate indifference to Plaintiff's dental needs; and Defendants are entitled to qualified

15 immunity.

16 **II. LEGAL STANDARD**

17     The legal standard governing this motion is well settled: a party is entitled to summary

18 judgment when "the movant shows that there is no genuine issue as to any material fact and the

19 movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

20 *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

21 evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

22 *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

23

---

[2] Plaintiff named Peterson as a defendant, but the correct defendant is Dr. Mardelle Petersen.

of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

1   omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

2   defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

3   an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

4   party cannot establish an element essential to that party's case on which that party will have the

5   burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

6         If the moving party satisfies its initial burden, the burden shifts to the opposing party to

7   establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

8   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

9   dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

10  be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

11  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

12  (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

13  by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

14  U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

15  pleadings and set forth specific facts by producing competent evidence that shows a genuine

16  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

17        **III. DISCUSSION**

18  **A. Rule 56(d)**

19        Plaintiff asks the court to defer or deny summary judgment for Mitchell because he was

20  not given the chance to pursue outstanding discovery with respect to Mitchell.

21        "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

22  present facts essential to justify its opposition, the court may: (1) defer considering the motion or

23

deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

"Rule 56(d) provides a 'device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence.'" *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002)). "A party seeking additional discovery under Rule 56(d) must 'explain what further discovery would reveal that is essential to justify [its] opposition to the motion[ ] for summary judgment.'" *Id.* (quoting *Program Eng'g, Inc. v. Triangle Publ'ns, Inc.*, 634 F.2d 1188, 1194 (9th Cir. 1980) (alterations original, quotations omitted).

"[T]he evidence sought must be more than 'the object of pure speculation.'" *Id.* (citation omitted). "A party seeking to delay summary judgment for further discovery must state 'what other *specific* evidence it hopes to discover [and] the relevance of that evidence to its claims.'" *Id.* (quoting *Program Eng'g*, 634 F.2d at 1194) (alteration and emphasis original).)

"In particular, '[t]he requesting party must show [that]: (1) it has set forth in affidavit form *the specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.'" *Id.* (quoting *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008)) (emphasis and alteration original).

Plaintiff filed a motion asserting that he had not been provided discovery for Mitchell. (ECF No. 103.) On January 27, 2021, the undersigned noted Chief Judge Du's order of January 19, 2021, which did not extend discovery as to Mitchell because she was not a newly added defendant. As such, discovery closed as to Mitchell in August of 2020, and so the court denied Plaintiff's motion. (ECF No. 114.)

1   Plaintiff filed a motion for an extension of time to complete discovery as to defendant

2   Mitchell. (ECF No. 104.) The court denied Plaintiff's motion, advising him that if he was

3   seeking to reopen or extend discovery as to Mitchell, he must comply with Local Rule 26-6.

4   (ECF No. 115.)

5   Plaintiff also filed motions to compel concerning Mitchell and the other defendants. (ECF

6   Nos. 110, 118.) The court denied the motions as to Mitchell, finding that the discovery requests

7   to Mitchell were untimely as discovery had not been extended as to Mitchell, and Mitchell was

8   not required to respond to untimely discovery. (ECF No. 150.)

9   In sum, Plaintiff was not deprived of the opportunity to conduct discovery as to Mitchell.

10   Instead, his efforts to seek discovery were untimely and improper. Moreover, Plaintiff does not

11   include a declaration or affidavit setting forth the specific facts he hopes to elicit from further

12   discovery; that those facts exist; and how those facts are essential to opposing the motion for

13   summary judgment as to Mitchell. Therefore, Plaintiff's request to deny the motion or defer

14   ruling on it under Rule 56(d) should be denied.

15   **B. Dr. Benson's Declaration**

16   Plaintiff objects to Dr. Benson's declaration on the bases that it is hearsay and it is not

17   made on personal knowledge since Dr. Benson was not present for most of these appointments.

18   Plaintiff asks the court for sanctions related to the filing of Dr. Benson's declaration.

19   Dr. Benson's declaration merely contains a summary of Plaintiff's dental records, which

20   is helpful to the court, particularly where the dentists' handwriting is difficult to read or where

21   shorthand dental terms are utilized in the records. The information in the declaration is not

22   offered to prove the truth of the matters asserted, as the records themselves do that; and,

23   therefore, the declaration does not contain hearsay. Fed. R. Evid. 801. Nor does Dr. Benson need

to have personal knowledge of what occurred in the appointments to provide a *summary* of Plaintiff's records. Therefore, Plaintiff's objection to Dr. Benson's declaration should be overruled, and his request for sanctions should be denied.

**C. Eighth Amendment**

    **1. Standard**

    "The government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

    A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

    If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds in Peralta v. Dillard,* 744 F.3d 1076 (9th Cir. 2014) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

In *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980), the Tenth Circuit noted that "[p]risoners generally have more extensive dental problems than the average citizen. Consequently, dental care is one of the most important medical needs of inmates." In *Peralta v. Dillard*, the Ninth Circuit highlighted that providing dental care in prisons can be difficult:

> Security concerns dictate that only one prisoner be in the examining room at a time, even if there's more than one chair, and that no prisoner be left alone, lest he try to use dental tools as weapons. Further exacerbating the problem, only emergency cases

1          can be seen when the prison is in lockdown and dentists can't
        accept prisoners' complaints at face value, as inmates often try to
2          jump the line by exaggerating symptoms.

3  *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014).

4        Nevertheless, "the Eighth Amendment requires that prisoners be provided with a system

5  of ready access to adequate dental care." *Hunt v. Dental Dept.*, 865 F.2d 198, 200 (9th Cir. 1989)

6  (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)).

7        "[D]elay in providing a prisoner with dental treatment, standing alone, does not constitute

8  an eighth amendment violation," however, where an inmate alleges that prison officials are

9  aware that the delay was causing pain and resulting in damage to teeth, he states an Eighth

10  Amendment claim. *Id*. (citing *Fields v. Gander*, 734 F.2d 1313, 1315 (8th Cir. 1984) (plaintiff

11  claimed jail knew of pain from infected tooth but refused to provide care for up to three weeks)).

12  **2. Dental Records[3]**

13        Dr. Benson provides the following information that is useful in assessing Plaintiff's

14  dental records: teeth are numbered 1-32 starting on the upper right wisdom tooth 1 and going

15  across the arch and ending with the upper left wisdom tooth 16, and continuing on the lower left

16  wisdom tooth 17 to the lower right wisdom tooth 32. Letters refer to the surfaces of the tooth.

17  B=buccal, F=facial, L= lingual, M =mesial, D =distal, I =incisal, O=occlusal and P =palatal.

18  (Dr. Benson Decl., ECF No. 19-1 at 3 ¶ 4.)

19

20

21    [3] Plaintiff argues that Defendants improperly and deceitfully included records and a timeline that
22  goes into 2019 and 2020, and Plaintiff contends the relevant timeframe is from March 17, 2015
to December 13, 2018. (ECF No. 216 at 4-5.) Plaintiff's own FAC lists the dates of the alleged
23  constitutional violations as ongoing since 2015. (ECF No. 2017 at 1.) Moreover, the full timeline
of Plaintiff's dental care provides a useful view of the entirety of the dental care Plaintiff has
received. Insofar as Plaintiff frames this as an objection, it should be overruled.

Plaintiff was seen on intake on March 17, 2015. It was noted that he had cavities on teeth 4, 5, 8, 9, 12, 13, 15, 18, 20, 29 and 31. (ECF No. 192-1 at 14; ECF No. 216 at 47.) He was described as needing further dental care, though it was not classified as urgent. (ECF No. 216 at 48.)

On May 7, 2016, Plaintiff sent a kite stating that he needed deep scaling/cleaning because his teeth had a lot of plaque build up and hurt. He was told that he was placed on the urgent care dental list. (ECF No. 216 at 34.)

He had a limited exam with Dr. Petersen on June 30, 2016, and he was added to the cleaning list. (ECF No. 192-1 at 13; ECF No. 216-1 at 155.)

Plaintiff sent a kite on October 2, 2016, stating that he had a cavity in his upper left molar and was in extreme pain. He said that he believed it went all the way to the root because "it hurts so bad." He was told he was placed on the urgent care dental list. (ECF No. 216 at 35.)

On December 19, 2016, Plaintiff had a limited exam with Dr. Petersen where his chief complaint was regarding tooth 19. An x-ray was taken and it was explained to Plaintiff that the tooth could be restored or extracted. He reported a lot of sensitivity, and was advised that he had receding gingiva. He was given an oral hygiene handout and was instructed to return for desensitization and then restoration or extraction of tooth 19. He reported extreme fear of the dentist, and as such was told to return for desensitization first, as he wanted to go slowly. (ECF No. 192-1 at 13; ECF No. 216-1 at 97, 156.)

Entries on January 4 and 19, 2017, state that Plaintiff was a "no show" to his dental appointments. (ECF No. 192-1 at 13; ECF No. 216-1 at 97.)

On February 15, 2017, Plaintiff sent a kite stating that he had multiple cavities that he had been kiting to get filled for over a year that he felt were getting worse and his teeth hurt. He was

told that he "no showed" two appointments and was removed from the list, but would be added to the list from the date of this kite. (ECF No. 190-2 at 43; ECF No. 216 at 36.)

On April 3, 2017, Plaintiff saw Dr. Petersen for desensitization on teeth 18 and 19. He was given Sensodyne for those teeth. He was to return for restoration or extraction of tooth 19 and an x-ray of teeth 8 and 9. (ECF No. 19201 at 13; ECF No. 216-1 at 97.)

The entry for April 12, 2017, states that Plaintiff was a "no show" for his dental appointment. (ECF No. 192-1 at 13; ECF No. 216-1 at 97.)

Plaintiff saw Dr. Petersen on April 26, 2017, for re-evaluation of tooth 19, and x-rays were taken of teeth 8, 9 and 19. Plaintiff signed a refusal to extract tooth 19. Plaintiff was to return for re-evaluation of tooth 19. He reported sensitivity to teeth 8 and 9. Imaging was taken. Plaintiff was to return for evaluation of teeth 8 and 9 and for possible restorations to those teeth. He was given rinse. (ECF No. 192-1 at 13; ECF No. 216-1 at 97; ECF No. 192-2 at 23.)

Plaintiff saw Dr. Petersen on September 20, 2017, and had a full mouth exam and x-rays were taken. He had caries[4] on teeth 8, 10, and 29. It was also noted that he had a large carious lesion[5] on tooth 19. Tooth 19 was indicated as having a poor prognosis, but Plaintiff stated he did not want treatment of that tooth. He was to return for restoration of teeth 29, 8 and 10, and for re-evaluation of tooth 19. He was given oral hygiene instructions and rinse. (ECF No. 192-1 at 13; ECF No. 216-1 at 97, 159.)

Plaintiff sent a kite on November 16, 2017, asking when he could have these four cavities filled. He was told he was on the NNCC dental list. (ECF No. 190-2 at 32; ECF No. 216 at 37.)

---

[4] Caries refers to tooth decay. *See https://www.nidcr.nih.gov/health-info/tooth-decay*, last visited November 12, 2021.

[5] A carious lesion is visible breakdown in the tooth surface (a hole). *See https://www.ncbi.nlm.nih.gov/books/NBK54546/#:~:text=Carious%20lesions%20where%20there%20is,tooth%20decay%20or%20'cavities'),* last visited November 12, 2021.

On February 26, 2018, Plaintiff saw Dr. Yup for restoration of the mesial, facial and lingual surface of teeth 8 and 10. (ECF No. 192-1 at 11; ECF No. 216-1 at 99; ECF No. 192-2 at 20; ECF No. 216-2 at 2.)

On March 7, 2018, Plaintiff saw Dr. Petersen for restoration of the mesial surface of tooth 31, and of the distal and occlusal surface of tooth 29. (ECF No. 192-1 at 11; ECF No. 192-2 at 19; ECF No. 216-1 at 99.)

On March 22, 2018, Plaintiff saw Dr. Petersen for restoration of the lingual surface of tooth 2, the distal and mesial surface of tooth 7, the distal surface of tooth 10 and the occlusal surface of tooth 12. (ECF No. 192-1 at 11; ECF No. 192-2 at 18; ECF No. 216-1 at 99.)

Plaintiff sent a kite on April 27, 2018, stating that he believed he had an abscess on the gumline where his last dental work was done. He reported nausea, vomiting, soreness to the gum line and fever. He was placed on the urgent care dental list. (ECF No. 190-2 at 24; ECF No. 216 at 38; ECF No. 216-1 at 99.)

Plaintiff saw Dr. Petersen on May 8, 2018, for a limited exam for complaints of swelling and pain in the lower left area of tooth 19. An x-ray was taken which showed an infection of tooth 19. Plaintiff refused extraction of tooth 19. He was to return for fillings of the mesial and lingual surface of tooth 2, the distal and lingual surface of tooth 10, the mesial surface of tooth 6, the mesial surface of tooth 15, the mesial, occlusal and distal surface of tooth 29, and the facial surface of tooth 27. (ECF No. 192-1 at 11-12; ECF No. 192-2 at 17; ECF No. 216-1 at 99-100.)

Plaintiff saw Dr. Petersen on June 18, 2018, for restoration of the facial surface of tooth 27, and the distal and occlusal surface of tooth 29. (ECF No. 192-1 at 11; ECF No. 192-2 at 16; ECF No. 216-1 at 99.)

Plaintiff sent a kite on September 27, 2018, noting that he had asked three months ago to be seen for pain, cavities, gum disease, deep scaling/cleaning and a root canal. He reported four cavities on his top front teeth that the dentist supposedly fixed, but never did and just "butchered them." He said he was still in pain and asked for his cavities and pain to be fixed. The response states: "I understand. But since it's only me and Dr. we have been cleaning up. You are on the list. Just be patient and I'll get you in." (ECF No. 1902 at 22; ECF No. 216 at 39.)

Plaintiff sent another kite to Dr. Petersen on October 17, 2018, stating that his top four front teeth had cavities, and also complained about his bottom molars, his gums, and his left side/bottom rear molar needing a root canal. He said that his teeth had hurt for a long time and were in dire need of deep scaling/cleaning. (ECF No. 216 at 40.)

He had a limited examination with Dr. Petersen that day. The nurse had provided Plaintiff with antibiotics, but he had refused to take them. X-rays were performed and the root of tooth 19 appeared to still be infected. There was a huge abscess, but Plaintiff said he did not want to take the antibiotics. He was given another 10-day course of antibiotics and a bottle of rinse. He was instructed to return in 10 days to extract tooth 19 and to fill the front teeth. (ECF No. 192-1 at 11; ECF No. 216-1 at 99; ECF No. 192-2 at 13.)

Plaintiff saw Dr. Petersen again on October 24, 2018, and reported that he did not want tooth 19 extracted because he was in litigation with Dr. Yup over that tooth and wanted to save the evidence. He did want the restorations of the mesial surface of teeth 7 and 10 completed. (ECF No. 192-1 at 9, 11; ECF No. 216-1 at 99, 101; ECF No. 192-2 at 11, 12.)

On November 25, 2018, Plaintiff sent a kite asking for a priority appointment to fill the filling that fell out that day and had him in excruciating pain. He was told that he was on the NNCC dental list. (ECF No. 216 at 41.)

Plaintiff sent another kite on December 4, 2018, stating his dental needs had been rejected because of a policy towards inmates receiving root canals, fillings and crowns and receiving extraction. The response states that no inmates were getting root canals. If the tooth is "fixable we could place a filling. If not, its extraction." The response also notes that Plaintiff was seen on December 13, 2018. (ECF No. 190-2 at 18; ECF No. 216 at 42.)

Plaintiff had a limited examination with Dr. Petersen on December 13, 2018. He complained that he felt ignored by dental. He was having issues with the tooth in front of tooth 19, as a restoration had fallen out and he wanted to have it fixed. There was a meeting with Melissa (Mitchell), Jenny (Vargas), Kassy and Dr. Petersen. Plaintiff was to return for treatment for the lost filling. He was given Sensodyne and rinse. (ECF No. 192-1 at 9; ECF No. 216-1 at 101.)

On January 10, 2019, he had a restoration of the distal, occlusal and buccal surface of tooth 20. (ECF No. 192-1 at 9; ECF No. 216-1 at 101.)

Plaintiff sent a kite on January 13, 2019, that the filling that had been placed in tooth 20 had fallen out and needed to be re-filled. He was advised that he was on the NNCC dental list. (ECF No. 190-2 at 16; ECF No. 216 at 43.)

On March 22, 2019, Plaintiff sent a kite that he had not been seen for the filling that fell out. He was told he was on the list and his patience was appreciated. (ECF No. 190-2 at 14; ECF No. 216 at 44.)

On April 11, 2019, he reported two fillings had broken. He had fractured fillings at teeth 8, 20 and 7, and there was decay into pulp at tooth 19. It was recommended that tooth 19 be extracted. Plaintiff consented and tooth 19 was extracted. (ECF No. 19201 at 8-9; ECF No. 216-1 at 101, 104; ECF No. 192-2 at 7.)

On April 17, 2019, Plaintiff sent a kite that Dr. Benson had prescribed him a long-handle toothbrush and Vargas refused to give it to him until he was seen by a regular doctor. The response states that no long-handled toothbrush was ordered for him. (ECF No. 190-2 at 13.)

Plaintiff was seen on April 25, 2019, following the extraction of tooth 19, and he was healing. He was concerned about teeth 8, 9 and 18, and was advised they would check on those teeth at his next visit. (ECF No. 192-1 at 7; ECF No. 216-1 at 103.)

Plaintiff had restoration of the mesial, distal and buccal surface of tooth 18 and the distal and occlusal surface of tooth 20 performed on June 6, 2019. (ECF No. 192-1 at 7; ECF No. 192-2 at 6; ECF No. 216-1 at 103.)

On August 8, 2019, Plaintiff had restoration of the distal, facial and lingual surface of tooth 9 performed. (ECF No. 192-1 at 7; ECF No. 216-1 at 103; ECF No. 192-2 at 5.)

On October 2, 2019, Plaintiff had restoration of the mesial, distal and lingual surface of tooth 7 performed. (ECF No. 192-1 at 7; ECF No. 216-1 at 103; ECF No. 192-2 at 4.) On October 17, 2019, he had restoration of the distal and lingual surface of teeth 6 and 11. (ECF No. 192-1 at 7; ECF No. 216-1 at 103; ECF No. 192-2 at 2.)

Plaintiff sent a kite on June 2, 2020, that he was in pain because his upper molar filling had fallen about. He was advised that he was on the NNCC dental list. (ECF No. 190-2 at 9; ECF No. 216 at 45.) Plaintiff sent another kite about pain in this molar on July 12, 2020. There is a notation that he was seen on July 20, 2020. (ECF No. 190-2 at 2.)

Diagnostic testing was performed for tooth 15 on July 22, 2020, and there was a guarded prognosis due to the extent of the fracture and proximity to the nerve. A filling was placed in tooth 15. (ECF No. 192-1 at 7; ECF No. 216-1 at 103.) It was recommended he follow up in four to eight weeks. (ECF No. 192-1 at 7; ECF No. 216-1 at 103.)

Plaintiff was seen by Dr. Benson for a follow up on September 17, 2020. X-rays were taken and desensitizer and topical fluoride were placed. (ECF No. 192-1 at 5; ECF No. 216-1 at 105.)

Plaintiff saw Dr. Benson on October 27, 2020. He reported that he felt better, but that tooth 8 was chipped. The treatment plan was as follows: "prophyl/scale" and work on teeth 29, 18, 20, 12, 11, 10, 9, 8, 2. (ECF No. 192-1 at 2, 4; ECF No. 216-2 at 19.) Dr. Benson performed a filling on tooth 29 on November 18, 2020. (ECF No. 191-1 at 2.) He had scaling and root planning on the upper right quadrant on January 4, 2021. (ECF No. 192-1 at 2.) He had additional cleaning on January 28, 2021. (ECF N. 192-1 at 2.) On May 17, 2021, he had fillings on teeth 8, 9 and 10. (ECF No. 192-1 at 2.)

Medical Directive 408 provides that dental restorations will be considered after evaluation of carious teeth with enough structural integrity to provide long term stability. Preventive services such as prophylaxis, gross debridement, and scaling/root planning will be considered after evaluation by the dentist. Root canals will not be performed on anterior teeth if the dentist determines extraction is appropriate due to non-restorability, periodontal involvement or the tooth can be replaced by an addition to an existing or proposed prosthesis. (ECF No. 190-3.) Under Administrative Regulation (AR) 631, root canals on posterior teeth are not performed unless the tooth is an integral part of a bridge or support or crown that is already present or at the discretion of the dentist when medically necessary. (ECF No. 190-4 at 4.) Medical Directive 408 was revised in June of 2019, to state that appointments are scheduled based on a priority system that considers the medical kite and service report by the dentist. (ECF No. 190-4 at 3-4.)

### 3. Analysis

#### a. Vargas

Vargas admits that she scheduled Plaintiff's appointments from 2017 through mid-2019. (ECF No. 216 at 114, response to RFA 6.) Vargas also acknowledges that dental records indicate that Plaintiff needed deep cleaning and root scaling. (ECF No. 190-6 at 7, response to interrogatories 7 and 8; ECF No. 216 at 127.) A review of Plaintiff's records reveals that there were several occasions where there were significant delays in having Plaintiff seen by dental. For instance, at his April 26, 2017 appointment, Dr. Petersen recommended that Plaintiff return for re-evaluation of tooth 19 and for restoration work on teeth 29, 8 and 10; however, Plaintiff's next visit was not until roughly five months later, on September 20, 2017. At that visit, he was again instructed to return for restoration of teeth 29, 8 and 10 and for re-evaluation of tooth 19. Plaintiff sent a kite 58 days later, on November 16, 2017, asking when he could have his cavities filled. He was told he was on the dental list, but he did not see a dentist until over three months later, on February 26, 2018, when Dr. Yup performed restoration work on teeth 8 and 10. Plaintiff sent a kite on January 13, 2019, that the filling that had been placed in tooth 20 had fallen out, and was told he was on the list, but two months later, he had not been seen and sent another kite on March 22, 2019. He was eventually seen on April 11, 2019, three months after he sent his initial kite about the filling falling out and his excruciating pain.

While there is no evidence that Vargas had any role in determining the course of treatment Plaintiff received at his visits, the records do reveal some delays of significant duration between when he sent a kite about dental issues and when he was seen.

> Prison staff need not have expert medical training to know that once begun, tooth decay is a continual process leading to larger health problems and, often, excruciating pain. While such decay may not normally be an emergency, the continual delay of

1    treatment, especially when spread over years rather than a handful
2    of months, turns 'mere delay' into a potentially 'substantially'
     harmful situation.

3    *Antonetti v. Nevin*, No. 2:08-cv-01020-KJD-LRL, 2011 WL 4527413, at *3 (D. Nev. Sept. 28,
4    2011).

5        Taking the evidence in the light most favorable to Plaintiff, he has created a genuine

6    dispute of material fact as to whether he suffered harm due to the delay given the evidence shows

7    that he continued to complain of pain associated with his various dental issues. *See Hunt,* 865

8    F.2d at 201 (reversed grant of summary judgment where there was a delay of more than three

9    months of untreated pain before inmate received treatment for dental issue). Therefore, to the

10   extent Plaintiff's claim against Vargas is based on his allegation that she contributed to delays in

11   scheduling his dental appointments while he suffered in pain, the motion for summary judgment

12   should be denied.

13       Insofar as Plaintiff alleges that Vargas denied him a long-handle toothbrush, Plaintiff's

14   response provides no evidence that a dentist ordered him a long-handle toothbrush, or that he

15   suffered harm due to the denial of the long-handle toothbrush. Therefore, the motion should be

16   granted to the extent Plaintiff's claim against Vargas is based on the allegation that she refused

17   Plaintiff a long-handle toothbrush.

18       Plaintiff also argues that Vargas was assisting Dr. Yup on February 26, 2018, when

19   Dr. Yup maliciously chipped his 9 and 10 teeth, and Vargas failed to report this; however,

20   Plaintiff presents no evidence to support his claim that Dr. Yup *maliciously* chipped his teeth.

21   More importantly, he submits no evidence to support his claim that Vargas had any involvement

22   in the alleged chipping of his teeth. Insofar as Plaintiff's claim against Vargas is based on

23   allegations that she maliciously participated in chipping his tooth on February 26, 2018, the

     motion for summary judgment should be granted.

Finally, Plaintiff contends that Vargas improperly involved Mitchell in his dental care plan on December 13, 2018, and conveyed his confidential dental information to Mitchell. In her discovery responses, Vargas said that Mitchell was asked to be involved in a meeting with Plaintiff to see why he felt like he was being ignored and to explain to him that there are side effects with taking antibiotics for too long. (*See* ECF No. 190-6 at 8-9, Vargas response to interrogatory 11.) Plaintiff has provided no evidence that in asking Mitchell to speak with Plaintiff, Vargas knew of and disregarded a risk to Plaintiff's dental health. To the extent Plaintiff is claiming some sort of HIPPA violation, "HIPPA itself provides no private right of action." *Seaton v. Mayberg*, 610 F.3d 530, 533 (9th Cir. 2010). Therefore, the motion for summary judgment should be granted to the extent Plaintiff's claim against Vargas is based on allegations of improperly involving Mitchell in his dental care on December 13, 2018, or disclosing confidential health information to Mitchell.

In sum, it is recommended that Defendants' motion for summary judgment be denied insofar as Plaintiff alleges that Vargas contributed to delays in scheduling his dental appointments, but summary judgment should be granted in Vargas' favor as to the other aspects of Plaintiff's claim against her.

### b. Mitchell

According to Defendants, on December 13, 2018[6], Mitchell was asked to be involved in a meeting with Plaintiff to see why he felt like he was being ignored. At that time, he had refused three times to have tooth 19 extracted and it was infected badly and he could not continue taking

---

[6] The parties reference both December 13, 2018 and December 13, 2019; however, the court assumes they are referring to his December 13, 2018 appointment with Dr. Petersen, as is reflected in his dental records.

1 antibiotics, and so Mitchell was asked to explain to him that too many antibiotics can cause bad

2 side effects. (ECF No. 190-6 at 8-9, Vargas response to interrogatory 11.)

3       In his declaration, Plaintiff states that on December 13, 2018, Mitchell came and told him

4 to sit down and said, "What is wrong with you that you write these kites starting with remedy."

5 Plaintiff responded that he had been in excruciating pain and so he now started his kites with

6 what needed to be done. Mitchell said that Plaintiff had been seen eight times that year and, "per

7 AR 740, there is no such thing as a dental emergency in [NDOC]." She also advised him that

8 they no longer performed root canals, and the only option for care was to pull tooth 19. She also

9 told him that tooth 19 was off the table for discussion since he had signed multiple refusals (to

10 have the tooth extracted), and that if he brought it up again and needed antibiotics they would not

11 be "keep on person" (KOP). Plaintiff argues Mitchell acted beyond the scope of her duties by

12 telling Dr. Petersen, "he's done." (ECF No. 216 at 85; ECF No. 216-1 at 114 ¶ 2.)

13       By the time of the December 13, 2018 meeting with Mitchell, Plaintiff had refused

14 Dr. Petersen's recommendation of extraction of tooth 19 on April 26, 2017, September 20, 2017,

15 May 8, 2018, and October 17 and 24, 2018, while x-rays revealed an infection and abscess.

16 Plaintiff had also refused antibiotics to treat the infection. To the extent Plaintiff claims that

17 Mitchell told him that the only option for care was to pull tooth 19, that is entirely consistent

18 with what Dr. Petersen had recommended in his recent visits. Plaintiff admits Mitchell was not

19 involved in the treatment of Plaintiff's teeth. (ECF No. 190-5 at 7, response to request for

20 admission (RFA) 44.) If Mitchell had no role in Plaintiff's dental treatment, she was not

21 deliberately indifferent to his serious dental needs. Plaintiff takes issue with Mitchell "acting

22 beyond the scope of her duties," but that does not rise to the level of deliberate indifference.

23       Therefore, summary judgment should be granted in Mitchell's favor.

c. **Estate of Dr. Yup**

Defendants argue that Dr. Yup had only one dental encounter with Plaintiff on February 26, 2018, where he performed two fillings on the mesial, facial and lingual surfaces of teeth 8 and 10. (ECF No. 190-7 at 4, response to RFA 3.)

Plaintiff references a timeline from a brief filed by defense counsel in this action which states that Dr. Yup had recommended an extraction for Plaintiff on April 26, 2017 (*see* ECF No. 40 at 2); however, the dental records themselves reflect that it was Dr. Petersen and not Dr. Yup who saw Plaintiff on that date. Plaintiff asserts that he saw Dr. Yup on more than this one occasion, but he provides no evidence to support that claim.

Plaintiff's dental records only reflect that Plaintiff received treatment from Dr. Yup on one occasion, on February 26, 2018, where Dr. Yup performed restoration work on two teeth. Otherwise, Plaintiff saw either Dr. Petersen, and then later, Dr. Benson.

The court will now address Plaintiff's specific allegations as to Dr. Yup.

i. **Cleaning and Fillings**

Plaintiff requested scaling due to pain in May of 2016, and Dr. Petersen added him to the cleaning list in June of 2016, but he did not receive any cleaning until 2021. On intake, it was noted that he had cavities on teeth 4, 5, 8, 9, 12, 13, 15, 18, 20, 29 and 31 (ECF No. 216 at 47); however, Plaintiff did not receive any fillings between 2015 and 2017.

Insofar as Plaintiff alleges that he did not have a cleaning until 2021, Dr. Petersen and Dr. Benson were the primary dental providers that evaluated and treated Plaintiff. As was mentioned above, the dental records indicate that Plaintiff only saw Dr. Yup on one occasion, on February 26, 2018; therefore, Dr. Yup could not have been responsible for providing Plaintiff with fillings between 2015 and 2017.

21

The court cannot conclude that Dr. Yup was deliberately indifferent in failing to provide Plaintiff with cleaning between 2016 and 2021 or fillings between 2015 and 2017 when the record reflects that Plaintiff was only seen by Dr. Yup for treatment on one occasion in 2018. Nor is there evidence that Plaintiff addressed a kite on these issues to Dr. Yup or that Dr. Yup received or responded to any of Plaintiff's dental kites so as to demonstrate he knew of and disregarded a risk to Plaintiff's dental health.

Therefore, summary judgment should be granted in favor of the Estate of Dr. Yup insofar as Plaintiff alleges that Dr. Yup contributed to the failure to provide him with cleanings or fillings.

### ii. Teeth 8 and 10

Plaintiff asserts that he had to wait until February 28, 2018, for treatment of these teeth, and that Dr. Yup intentionally destroyed teeth 8 and 10. (ECF No. 216-2 at 3.) To support the latter claim, Plaintiff provides a photograph taken of his front teeth with a notation that the front tooth has a chip in it. (ECF No. 216-2 at 20.)

In their reply, Defendants contend that the only evidence Plaintiff provides that Dr. Yup chipped his tooth on February 26, 2018, is a photograph taken after this lawsuit was commenced, but there is no evidence that it was in fact Dr. Yup that chipped Plaintiff's tooth.

Plaintiff provides no evidence that Dr. Yup had any involvement in a delay in providing treatment for teeth 8 and 10. Instead, the dental records reflect that up to that point Plaintiff had only seen Dr. Petersen.

Discovery responses for the estate of Dr. Yup state that Dr. Yup performed two fillings to restore two teeth, and did not ruin them. (ECF No. 216-1 at 10, response to interrogatory 5.)

1  Plaintiff claims that Dr. Yup intentionally destroyed his teeth in retaliation for Plaintiff filing a

2  grievance about his refusing treatment, but Plaintiff provides no evidence to support this

3  contention. He does not provide the purported grievance he filed. Nor does he explain how or

4  when Dr. Yup knew that Plaintiff had filed a grievance to establish a connection between the

5  grievance and the chipped tooth. His claim that  Dr. Yup *intentionally* chipped Plaintiff's front

6  tooth is purely speculative. The allegation of the chipped tooth sounds in negligence, at best, but

7  does not rise to the level of deliberate indifference.

8      Therefore, summary judgment should be granted in favor of the Estate of Dr. Yup to the

9  extent Plaintiff alleges Dr. Yup was deliberately indifferent with respect to his treatment of teeth

10  8 and 10.

11                    **iii. December 19, 2016 and April 3, 2017 Appointments**

12      Plaintiff contends that Dr. Yup is liable because Dr. Yup was present during his

13  appointments with Dr. Petersen on December 19, 2016, and April 3, 2017. (ECF No. 216-1 at

14  119 ¶¶ 2, 3.)

15      The records show that Dr. Yup may have been in the dental *office* on December 19, 2016

16  (ECF No. 140-14 at 27) and April 3, 2017 (ECF No. 140-14 at 22), but Plaintiff received

17  *treatment* from *Dr. Petersen* and *not Dr. Yup* on those dates. Other than generally stating that Dr.

18  Yup was present on those dates, Plaintiff does not explain, let alone point to evidence, to support

19  his claim that Dr. Yup was deliberately indifferent to Plaintiff's dental needs on those dates.

20  Therefore, summary judgment should be granted in favor of the Estate of Dr. Yup to the extent

21  Plaintiff alleges that Dr. Yup was deliberately indifferent during his appointments on

22  December 19, 2016 and April 3, 2017.

23

**iv. April 12, 2017 and April 26, 2017 Appointments & Tooth 19**

Plaintiff states that both Dr. Yup and Dr. Petersen refused to provide him with any care or medication on April 12, 2017 and April 26, 2017. In addition, he contends that on April 26, 2017, Dr. Yup said, "if it hurts, I'll pull it, but I won't waste my time on inmates." (ECF No. 216-1 at 110 ¶ 2.)

The dental records do not reflect that Dr. Yup was present on April 12, 2017, and April 26, 2017, as Plaintiff suggests. (ECF No. 221-1 at 2-3.) Instead, Plaintiff's dental records demonstrate that Plaintiff received treatment from *Dr. Petersen* and not Dr. Yup on April 26, 2017, for a re-evaluation of tooth 19 and for x-rays of teeth 8 and 9. At that time, Plaintiff refused extraction of tooth 19, and he was instructed to return for a re-evaluation of tooth 19 and for possible restoration of teeth 8 and 9. Plaintiff claims that on that date, Dr. Yup said, "if it hurts, I'll pull it, but I won't waste my time on inmates." Even if Dr. Yup did make this statement, there is no evidence that Dr. Yup played any significant role in Plaintiff's dental treatment at NNCC so as to conclude that this statement was the cause of a denial or delay in treatment.

Plaintiff argues that he did not receive treatment on tooth 19 until April of 2017, but both Dr. Yup and Dr. Petersen were made aware of that cavity six months earlier on December 19, 2016. Plaintiff's dental records indicate, however, that he saw Dr. Petersen, and not Dr. Yup, on December 19, 2016.

Other than the one appointment on February 26, 2018, there is no evidence that Dr. Yup had any other involvement in Plaintiff's dental treatment.

1    Defendants' motion for summary judgment should be granted insofar as Plaintiff alleges

2  that Dr. Yup was deliberately indifferent with respect to the appointments on April 12 and 27

3  and the treatment of tooth 19.[7]

### v. Conclusion as to Dr. Yup

5    The court recommends that summary judgment be granted in favor of the Estate of

6  Dr. Yup for the reasons discussed above.

7    Plaintiff's claims for denial and delay of dental treatment are appropriately asserted

8  against Dr. Petersen, who provided nearly all of Plaintiff's dental treatment until he started

9  receiving care from Dr. Benson.[8] Unfortunately, Dr. Petersen has passed away and there is

10  currently no estate; however, the court has recommended that Dr. Petersen be dismissed without

11  prejudice so that Plaintiff may raise his claims against her if and when he can locate the proper

12  defendant to sue in her place.

13    Plaintiff's response contains many arguments about Dr. Petersen's failure to provide

14  fillings or other dental work, but the undersigned has recommended her dismissal without

15  prejudice from this case. Therefore, the court has not considered Plaintiff's arguments as to

16  Dr. Petersen in this Report and Recommendation.

---

20    [7] Plaintiff also references a lawsuit that Dr. Petersen filed against Dr. Yup for harassment
21  (*see* ECF No. 216-2 at 26-33); however, this lawsuit has nothing to do with Plaintiff's claims
against Dr. Yup.

22  [8] As in *Hunt*, it may turn out that Plaintiff's dental problems were not as serious as he alleges, or
23  that Dr. Petersen was not deliberately indifferent to his need for dental care, but his allegations
state a colorable claim against Dr. Petersen for the denial or delay of dental care. *See Hunt*, 865
F.2d at 201.

Finally, Plaintiff's response also contains declarations from other inmates concerning their dental treatment at NNCC; however, these declarations do not demonstrate that any of the moving defendants were deliberate indifferent to *Plaintiff's* serious dental needs.

**D. Qualified Immunity**

"In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citing *Saucier v. Katz,* 533 U.S. 194, 200-01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009)).

The law was clearly established in *Hunt* that a delay of a dental examination of three months in the face of untreated pain could amount to deliberate indifference. *Hunt*, 865 F.2d at 200-01. Therefore, Vargas is not entitled to qualified immunity.

**IV. RECOMMENDATION**

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **STRIKING** Plaintiff's second addendum to his response (ECF No. 223);

(2) **DENYING** Plaintiff's request under Rule 56(d);

(3) **OVERRULING** Plaintiff's objection to Dr. Benson's declaration and **DENYING** his request for sanctions, and **OVERRULING** his objection to Defendants' timeframe of events; and

(4) **DENYING** Defendants' motion for summary judgment (ECF No. 190) insofar as Plaintiff alleges that defendant Vargas violated the Eighth Amendment by contributing to the delay in his being seen for dental appointments, but **GRANTING** Defendants' motion for summary judgment as to defendants Mitchell and the Estate of Dr. Yup, and with respect to the other aspects of Plaintiff's claim against Vargas.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: November 18, 2021

William G. Cobb
United States Magistrate Judge

27